| | |
|---|---|
| NICHOLAS DOUGLAS;<br>TASHEKA BRYAN;<br>JUNIOR HARRIS;<br>MARCUS RICHARDS;<br>STEPHANEY SMITH; and those<br>similarly situated,<br><br>      Plaintiffs,<br>v.<br><br>YELLOWSTONE CLUB<br>OPERATIONS, LLC; and<br>HOSPITALITY STAFFING<br>SOLUTIONS LLC,<br><br>      Defendants. | Civil Case No. _____<br><br>Jury Trial Demanded |

---

## CLASS ACTION COMPLAINT

---

## INTRODUCTION

1.  Plaintiffs are all black Jamaican citizens who spent the winter of 2017-2018

working in Montana as temporary non-immigrant H-2B visa workers. They

worked at the Yellowstone Club, an ultra-exclusive golf and ski club that counts

only the most elite as members.

2.  Plaintiffs came to Montana after promises that Yellowstone would employ

them, that they would be well taken care of as employees of this prestigious resort,

and that they would receive ample pay, including tips and service charges that could amount to $400-$600 or more a night at the nicest restaurants.

3.      Instead, Plaintiffs found themselves jointly employed by a temp-staffing firm from Georgia, robbed of their tips and service charges, and with deductions taken from their pay that they never agreed to.

4.      All the while, Plaintiffs faced discrimination. They watched other workers at the club—who were not black or Jamaican—do the same work as them, but be treated entirely different. These other workers received tips and service charges, were given better work, and received better treatment from their employers.

5.      Rather than the American opportunity promised, Plaintiffs winter in Montana was riddled with disappointment, illegally low pay, and discrimination.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under state law.

7.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Montana and because all Defendants are entities registered to do business in Montana.

## ADMINISTRATIVE EXHAUSTION[1]

8.      On September 14, 2018, Plaintiffs Douglas, Bryan, Harris, Richards, and Smith timely filed their Charges of Discrimination with the Equal Employment Opportunity Commission based on race, color and national origin discrimination against Yellowstone Club Operations, LLC (Douglas Charge No. 541-2018-03338, Bryan Charge No. 541-2018-03339, Harris Charge No. 541-2018-03336, Richards Charge No. 541-2018-03334, and Smith Charge No. 541-2018-03342).

9.      On September 14, 2018, Plaintiffs Douglas, Bryan, Harris, Richards, and Smith timely filed their Charges of Discrimination with the Equal Employment Opportunity Commission based on race, color and national origin discrimination against Hospitality Staffing Solutions, LLC.  (Douglas Charge No. 541-2018-03337, Bryan Charge No. 541-2018-03340, Harris Charge No. 541-2018-03335, Richards Charge No. 541-2018-03333, and Smith Charge No. 541-2018-03341)

10.     After Plaintiffs Douglas, Bryan, Harris, Richards, and Smith receive Notices of Right to Sue they will have administratively exhausted their claims against

---

[1] Plaintiffs Douglas, Bryan, Harris, Richards, and Smith will amend this Complaint to include claims of violation of the Title VII of the Civil Rights Act of 1964, 28 U.S.C. § 2000e *et seq.* ("Title VII") as soon as they receive Notices of Right to Sue authorizing them to do so pursuant to 28 U.S.C. § 2000e-5.

Defendants Yellowstone Club Operations, LLC and Hospitality Staffing Solutions, LLC under 42 U.S.C. § 2000e-5.

<h2 style="text-align:center">PARTIES</h2>

11.     At all times material to the allegations of the complaint, Plaintiffs were natural persons who are Jamaican citizens and resided in Montana.

12.     At all times material to the allegations of the complaint, Defendant YELLOWSTONE CLUB OPERATIONS, LLC (hereinafter "Yellowstone") was a Montana Limited Liability Company with its principal place of business in Gallatin County, Montana.

13.     At all times material to the allegations of the complaint, Defendant HOSPITALITY STAFFING SOLUTIONS LLC (hereinafter "HSS") was a Georgia Limited Liability Company registered to do business in Montana.

<h2 style="text-align:center">STATEMENT OF FACTS</h2>

**I.    Yellowstone**

14.     The Yellowstone Club is a private ski and golf club located on 15,200 acres outside of Big Sky, Montana.

15.     Upon information and belief, Yellowstone and its parents and subsidiaries own and operate the Yellowstone Club.

16.     Yellowstone is responsible for the day to day operations of the Yellowstone Club.

17.     In order to be a member of the Yellowstone Club, one must pay an initiation fee, buy a home located on the club premises, and pay annual dues.

18.     In 2009, the New York Times reported that the club initiation fee was $250,000, homes cost between $5 million and $35 million, and annual dues were $20,000.

19.     Notable current and former members of the Yellowstone Club include: Bill Gates, Eric Schmidt, Peter Chernin, Steve Burke, Dan Quayle, Bill Frist, Ben Affleck and Jennifer Garner, Justin Timberlake and Jessica Biel, Warren Miller, Peter Berg, Tom Brady and Gisele Bündchen, Phil Mickelson, Greg LeMond, Hank Kashiwa, and Tom Weiskopf.

20.     During his time as a cook at the Yellowstone Club, Plaintiff Douglas believes he prepared meals for Bill Gates, Warren Buffet, and Mark Zuckerberg.

21.     Yellowstone operates seven different restaurants at the Yellowstone Club serving its membership and their guests.

22.     Yellowstone is also responsible for housekeeping for some residences at the club.

## II.    **HSS**

23.    HSS is a nationwide staffing agency.

24.    Its corporate office is located in Atlanta, Georgia.

25.    On its website, HSS claims "Through selective grass roots recruiting Hospitality Staffing Solutions ensures you receive motivated, attentive personnel. To manage our greatest asset, Hospitality Staffing Solutions assigns each hotel, resort, or casino we serve with a supervisor as that property's point of contact. The supervisor recruits new talent, conducts new employee orientation, and functions as the day-to-day conduit between the property and Hospitality Staffing Solutions."

26.    HSS was hired by Yellowstone to assist in acquiring, supervising, and administering Jamaican workers who were cooks, bartenders, servers, and housekeepers at the Yellowstone Club.

## III.    **Plaintiffs' Employment by Defendants**

27.    Plaintiff and those similarly situated are all black Jamaican citizens.

28.    The Jamaican Ministry of Labor maintains a pool of Jamaican workers interested in coming to the United States and providing temporary work under a non-immigrant visa.

29.    Plaintiffs and those similarly situated all registered to be part of this pool.

30.     Yellowstone coordinated with the Jamaican Ministry of Labor to hold a recruiting event in Jamaica in or about the end of September 2017.

31.     Yellowstone engaged HSS prior to this recruiting event.

32.     Approximately 500 Jamaicans attended the recruiting event.

33.     Cindy McPheeters, the Director of Human Resources for Yellowstone, led the event. Also, there were several persons claiming to be agents of Yellowstone, including an executive chef, a chef de cuisine, and a man named Tim.

34.     At the meeting, Tim identified himself as an agent of Yellowstone, even wearing clothes with Yellowstone's logo on them.

35.     Plaintiffs later learned that Tim actually worked for HSS.

36.     At the beginning of the recruiting event, Ms. McPheeters addressed the entire group of potential recruits.

37.     She described Yellowstone as the only employer and described Yellowstone as a desirable place to work, prestigious, populated by famous people, and as a crème of the crop location.

38.     Ms. McPheeters also made representations regarding Yellowstone being a good employer. In particular, with regard to pay and working conditions, Ms. McPheeters assured the workers that they would be paid well, treated well, and "well taken care of."

39.     Plaintiff Douglas also remembers Ms. McPheeters making representations regarding tips and service charges when presenting to all of the potential recruits. In response to a question regarding tips and gratuities, which are generally available in Jamaica to workers in the hospitality industry, but not in all other countries, she told all of the workers they would be entitled to service charges and tips on top of their hourly pay "across the board."

40.     Bartenders and Servers also received written job descriptions at this meeting that promised that they would receive tips.

41.     Plaintiffs relied on these representations in eventually deciding to work for Yellowstone.

42.     Yellowstone made these representations with the sole purpose of inducing the workers to work for it.

43.     Interviews followed the presentation to the larger group of recruits.

44.     After interviews, Yellowstone selected approximately 110 workers to work for them in Montana on non-immigrant visas as cooks, servers, bartenders, and housekeepers.

45.     Every person hired as an H-2B worker was a black Jamaican.

46.     Plaintiff Douglas was hired as a cook.

47.     Plaintiff Bryan was hired as a bartender.

48. Plaintiff Harris was hired as a server.

49. Plaintiff Richards was hired as a server.

50. Plaintiff Smith was hired as a housekeeper.

51. A few weeks after the recruiting event, in approximately October or early November 2017, Yellowstone sent documents to the Jamaican Ministry of Labor by wire or mail for Plaintiffs and those similarly situated to use to secure their visas at the U.S. Embassy in Jamaica.

52. Plaintiffs and those similarly situated took documents that looked like contracts from the Ministry of Labor, brought them to the U.S. Embassy, and secured their visas.

53. The documents that were taken to the ministry of labor described the employer as only Yellowstone, which is what Plaintiffs and those similarly situated were originally told by Ms. McPheeters.

54. When they returned from the Embassy, the documents were taken from them and a contract, transmitted by Defendants to the Ministry of Labor by wire or mail, was provided for them to sign describing HSS as a party for the first time.

55. The Applications for Temporary Employment Certification submitted to, and approved by, the United States Department of Labor listed Yellowstone alone

as the employer and promised tips to bartenders and servers. They are attached to this Complaint as Exhibits 1, 2, 3, and 4.

56.     These certifications had been transmitted to the United States Department of Labor for approval via wire or mail and were subsequently approved with a signature by the United States Department of Labor.

57.     Plaintiffs and those similarly situated left Jamaica for the Yellowstone Club at the end of November, or early December 2017.

58.     After reaching the Yellowstone Club, it became clear almost immediately that HSS also employed Plaintiffs and those similarly situated.

59.     When Plaintiffs and those similarly situated arrived in Montana, there was a meeting where an agent of HSS described pay to the bartenders, cooks, and servers, described the work, and assured the workers that they would receive tips and service charges.

60.     Soon after arriving in Montana, HSS provided an employee handbook to Plaintiffs and those similarly situated stating that HSS *alone* was their employer.

61.     The handbook includes the following admonitions:

> I Understand that I **am an employee of HSS and am on assignment. I am not an employee of the client or property where I am placed to work.**
>
> …

> I understand that **HSS**, not the client and or property, **will determine and communicate my rate and any other pay** to me, as well as any information about HSS **benefits** to which I may be entitled.
>
> …
>
> I understand that I am **prohibited from participating in client benefits** or being deemed an employee of client properties **regardless of the number of hours** I work as a leased/contracted/ temporary employee of HSS.

(emphasis in original).

62.    But the contracts signed by Plaintiffs and those similarly situated describe Yellowstone as the employer, with the employment "managed in partnership with [HSS]."

63.    In reality, both Yellowstone and HSS employed Plaintiffs. Yellowstone controlled the daily work of Plaintiffs and those similarly situated, while pay and human resources were managed by HSS.

64.    HSS had agents on site at the Yellowstone Club to help provide these services.

65.    Plaintiffs and those similarly situated worked for Defendants at the Yellowstone club until late March or April of 2018.

## IV.   <u>Discrimination</u>

66.     All of the H-2B workers employed at the Yellowstone Club during the winter of 2017-2018 were black Jamaicans. No other black Jamaicans worked there who were non-H-2B workers.

67.     As black Jamaican H-2B workers, Plaintiffs and those similarly situated were paid less for the same work as compared to non-black, non-Jamaican, non-H-2B workers.

68.     When Plaintiffs demanded additional pay to equate their pay with other workers at the Yellowstone Club doing the same or similar work, Yellowstone and HSS refused.

69.     One form of discrimination was refusing to allow black Jamaican H-2B workers to receive service charges and tips, while allowing non-black, non-Jamaican, non-H-2B workers doing the same or similar work to receive tips and service charges.

70.     Cooks, like Plaintiff Douglas, were supposed to receive a percentage of the revenue for all food prepared in the kitchen as a service charge. Black Jamaican H-2B cooks did not receive these service charges. Non-black, non-Jamaican, non-H-2B cooks did receive these service charges.

71.    Servers, like Plaintiffs Harris and Richards, were supposed to receive a

percentage of the revenue for all food and drink they served as a service charge or

normal tips. Black Jamaican H-2B servers did not receive these service charges

and tips. Non-black, non-Jamaican, non-H-2B servers did receive this additional

compensation.

72.    At Plaintiff Harris's restaurant, servers could print out a receipt of their

gratuity each night. Service charges were a fixed percentage of the bill for each

table served. Plaintiff Harris's receipts reflected a service charge of 20% of the bill,

which was thousands of dollars over the course of the season. Black Jamaican H-

2B servers never received these service charges, while non-black, non-Jamaican,

non-H-2B servers did.

73.    Bartenders, like Plaintiff Bryan, were supposed to receive a service charge

equal to a percentage of the price of the drinks and food served by each bartender.

Black Jamaican H-2B bartenders never received these service charge, while non-

black, non-Jamaican, non-H-2B bartenders did.

74.    Housekeepers, like Plaintiff Smith, were supposed to receive pooled tips as

additional compensation. Black Jamaican H-2B housekeepers did not receive these

tips. Non-black, non-Jamaican, non-H-2B housekeepers did receive this additional

compensation.

75.    Plaintiffs, and other black Jamaican H-2B servers, cooks, and bartenders, complained about not receiving the same pay as their non-black, non-Jamaican, non-H-2B coworkers.

76.    There was a meeting between HSS CEO Tim McPherson and the Jamaican servers, cooks, and bartenders in the middle of the ski season after complaints that black Jamaican H-2B workers were not receiving the same compensation as non-black, non-Jamaican, non-H-2B workers. In that meeting, Mr. McPherson stated that black Jamaican H-2B would not receive tips because "[they] were not from here."

77.    After that meeting, a member of HSS human resources named Fay Wilson threatened a black Jamaican server who had complained during the meeting about his compensation, saying that he could always be "taken back to Jamaica."

78.    About 2 months before the end of their work, the black Jamaican H-2B housekeepers asked Yellowstone and HSS about their missing tips. There was a meeting with the black Jamaican H-2B housekeepers, Sheldon Brown (who Plaintiffs believe was a Jamaican government official), Tim McPherson from HSS, and Fay Wilson from HSS. The housekeepers were told that they would get their tips at the end of their employment.

79.    The black Jamaican H-2B housekeepers continued to work in reliance on this promise.

80.    However, the black Jamaican H-2B housekeepers did not receive any tips at the end of their employment, though some received a "bonus" that was substantially less than the missing tip compensation.

81.    In approximately March 2018, Cindy McPheeters, representing the Yellowstone Club's management, addressed the black Jamaican H-2B workers about not receiving service charges and tips. She promised the black Jamaican H-2B workers that the Yellowstone Club would give them bonuses instead. Despite being owed thousands or tens of thousands in unpaid tips and service charges, Plaintiffs and those similarly situated received "bonuses" that ranged in size from $0 to $2,000 or potentially more.

82.    Black Jamaican H-2B workers also experienced discrimination in the allocation of job duties.

83.    For example, Plaintiff Douglas was required to clean fryers while non-black, non-Jamaican, and non-H-2B cooks were not required to do this dangerous and unpleasant job.

84.    As another example, black Jamaican H-2B servers were not scheduled to work special functions at the Yellowstone Club, while non-black, non-Jamaican,

non-H-2B servers were scheduled for this work. The pay for these special functions was higher than the typical pay and therefore Plaintiffs and those similarly situated were denied the chance at higher compensation by being denied work at these special functions.

85.     As another example, Plaintiff Richards was a server at a low-end Yellowstone Club restaurant. Non-black, non-Jamaican, non-H-2B servers did not want to work at this restaurant because they would not receive as much compensation in tips as they could at a more expensive restaurant. As a result, only black Jamaican H-2B servers were assigned to this restaurant.

86.     Black Jamaican H-2B workers also received more scrutiny about their sick time and work hours.

87.     For example, Plaintiff Douglas was late to work one day because of a medical issue and he was chastised harshly by Dan, the sous chef, who said, "I don't give a fuck [about your medical issue.] Make sure you are at work." Non-black, non-Jamaican, and non-H-2B workers came in late or were missing from their chef stations but did not get in trouble.

88.     Plaintiffs and those similarly situated also suffered discrimination in their commute between their lodging and work.

89.    For example, black Jamaican H-2B workers were denied transportation on Yellowstone Club employee shuttles. One shuttle driver named Matt, an agent of Yellowstone, refused to allow black Jamaican H-2B workers to ride his hourly shuttle to and from the nearby town of Big Sky. Matt claimed that the Yellowstone Club policy was to refuse to take black Jamaican H-2B workers back to town on the shuttle because they were Jamaican.

90.    On another occasion, Plaintiff Douglas was told by Matt that black Jamaicans should "speak English" when they rode the bus, or he would "run this fucking bus over the cliff." He was angry because he could not understand the black Jamaicans' accented English.

**V.    Defendants' Illegal Pay Practices**

91.    During their employment at the Yellowstone Club, Plaintiffs and those similarly situated suffered from illegal pay practices implemented by Defendants which caused Plaintiff and those similarly situated to be paid illegally low wages.

### A. Illegal Withholding of Tips, Service Charges, or Other Gratuities (the "Tip Policy")

92.    Members and guests using Yellowstone restaurants and accommodations pay service charges and tips.

93.    Once in the United States, it became clear to Plaintiffs and those similarly situated that other workers were receiving tips and service charges—a fixed

percentage of sales at the restaurant or bar—paid by Yellowstone members and guests, while black Jamaican H-2B workers were not. *See supra* ¶¶ 67-81.

94.    Defendants therefore withheld tips and service charges paid by customers and guests from Plaintiff and those similarly situated.

95.    Servers in Plaintiff Harris's restaurant could get a receipt each night showing the tips they had accrued that day. Some of Plaintiff Harris's receipts are attached to this complaint as Exhibit 5.

96.    Plaintiff Harris, like all Plaintiffs and those similarly situated, did not receive the tips reported on these receipts.

97.    In Montana, service charges and tips are wages. *See* Mont. Code Ann. § 39-3-201.

### B. Illegal Pay Deductions (the "Deduction Policy")

98.    Yellowstone and HSS provided housing to Plaintiffs and those similarly situated.

99.    By agreement, a deduction for housing of $75.00 per week, not to exceed $300.00 per month, was taken from the pay of Plaintiff and those similarly situated.

100.   This was the only deduction from the pay of Plaintiffs' and those similarly situated that was part of their terms of employment and therefore the only deduction permitted under Montana law.

101.   Despite this, HSS and Yellowstone also made deductions for purported damages to the employer-provided housing and for plane tickets. Yellowstone admits to some of these deductions in an email attached as Exhibit 6, but simply blames HSS in the email and otherwise did nothing to correct the underpayment.

### C. Complaints

102.   Plaintiffs and those similarly situated complained repeatedly to both Defendants about these illegal pay practices.

103.   Defendants blamed the other, with Yellowstone claiming HSS was responsible for payroll and HSS claiming the decisions governing payroll were being made by Yellowstone.

104.   All the while, those who complained were threatened with being sent back to Jamaica if the complaints continued. *See e.g. supra* at 76-77.

## VI.   RICO Allegations

### A. The Enterprise

105.   Yellowstone and HSS formed an association-in-fact called the "Enterprise."

106.   Yellowstone and HSS formed this enterprise for the purpose of fraudulently inducing foreign H-2B labor to work at the Yellowstone Club and then benefiting from that fraud during the course of the employment of Plaintiffs and those similarly situated.

### B. Racketeering Activities

107.   Using the Enterprise, Yellowstone and HSS participated in a fraudulent scheme to induce Jamaican workers to work at the Yellowstone Club by making false representations to the workers in Jamaica, false representations to the Jamaican Ministry of Labor, and false representations to the United States Department of Labor regarding the terms and conditions of employment at the Yellowstone Club.

108.   The false representations included (1) promises of Plaintiffs and those similarly situated receiving tips and service charges when Defendants knew they would not; (2) promises of employment by Yellowstone alone and that Yellowstone would be a prestigious place to work and take good care of Plaintiffs and those similarly situated, when Defendants knew that HSS would also employ Plaintiffs and those similarly situated and implement illegal pay policies adversely affecting Plaintiffs and those similarly situated; and (3) promises to the Jamaican Ministry of Labor and the U.S. Department of Labor that Yellowstone alone would

employ Plaintiffs and those similarly situated, which induced those government agencies to facilitate the employment of Plaintiffs and those similarly situated.

109. All of these fraudulent statements constituted fraud in foreign labor contracting pursuant to 18 U.S.C. § 1351.

110. Moreover, sending the documents in furtherance of this fraud to the United States Department of Labor, the Jamaican Ministry of Labor, and to Plaintiffs and those similarly situated constituted wire and mail fraud pursuant to 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

### C. Defendants' Fraud Caused Damage to Plaintiffs' Money and Property

111. Plaintiffs relied to their detriment on the misrepresentations made to them by Yellowstone and HSS regarding Yellowstone being a good employer and their sole employer, and regarding the availability of service charges and tips.

112. Yellowstone and HSS knowingly made these false statements to Plaintiffs and those similarly situated, the United States Department of Labor, and the Jamaican Ministry of Labor for the sole purpose of inducing Plaintiffs and those similarly situated to work for Yellowstone and HSS.

113. The fraudulent representations caused Plaintiffs to lose money and property by inducing them to work for employers who offered service charges and tips,

accepted service charges and tips from members and guests on the workers' behalf, and, despite this, illegally withheld service charges and tips.

114. The only persons harmed by these misrepresentations were Plaintiffs and those similarly situated, whose tips and service charges were illegally withheld and who experienced illegal deductions from their pay.

## RULE 23 CLASS ALLEGATIONS

115. Plaintiffs allege all claims as a Fed R. Civ P. 23 class action on their own behalf and on behalf of the class for which they seek certification.

116. Pending any modifications necessitated by discovery, Plaintiffs preliminarily define the "Rule 23 Class" as follows:

> ALL EMPLOYEES OF YELLOWSTONE AND HSS
> WHO WORKED AT THE YELLOWSTONE CLUB ON
> NON-IMMIGRANT VISAS DURING THE WINTER
> OF 2017-2018

117. The classes are so numerous that joinder of all potential class members is impracticable. Plaintiffs do not know the exact size of the classes since that information is within the control of Defendants. However, Plaintiffs estimate that, based on the labor certifications submitted by Yellowstone to the United States Department of Labor, the class is composed of approximately 110 persons. The exact size of the class will be easily ascertainable from Defendants' records.

118.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include: Defendants' pay practices; Defendants' failure to pay employees all they are legally owed; the nature and extent of Defendants' fraud; and the nature and extent of Defendants' discrimination toward black Jamaican H-2B workers.

119.    The class claims asserted by Plaintiffs are typical of the claims of all the potential class members because they experienced the same or similar working conditions and pay practices as Defendants' other employees. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy. This is especially true in the case of low-wage, hourly, H-2B temporary workers, like the class members here, who are unsophisticated, are unlikely to seek legal representation, cannot realistically navigate the legal system pro se, and whose small claims make it difficult to retain legal representation if they do seek it.

120.    Plaintiffs will fairly and adequately protect and represent the interests of the class. They were Defendants' employees and were victims of the same violations of law as the other class members, including numerous violations of federal and state laws.

121.  Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in wage and hour class actions.

122.  The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

123.  Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and that the pertinent federal and state laws are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

124.  Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

125.  Plaintiffs are unaware of any pending litigation commenced by members of the classes concerning the instant controversy.

126.  It is desirable to concentrate this litigation in this forum because all Defendants are registered to do business in this district and the acts and omissions giving rise to this action largely occurred in this district or on foreign soil.

127.   This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage claims to both class litigation and the use of representative testimony and representative documentary evidence.

128.   The contours of the class will be easily defined by reference to the payroll documents Defendants were legally required to create and maintain.

<u>COUNT I</u>: CIVIL RICO, 18 U.S.C. 1964(c)

**Plaintiffs and the Rule 23 Class vs. All Defendants**

129.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

130.   Defendants Yellowstone and HSS violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

131.   Defendants Yellowstone, HSS, and the Enterprise engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate the fraud in foreign labor contracting statute (18 U.S.C. § 1351) and the mail and wire fraud statutes (18 U.S.C. § 1341 and 18 U.S.C. § 1343).

132.   By conducting the Enterprise through a pattern of racketeering, Defendants Yellowstone and HSS caused the injury of Plaintiffs and those similarly situated.

133.   Among other things, each of these RICO violations caused Plaintiffs and those similarly situated to suffer loss of past, current, and prospective wages and to spend unpaid time working as opposed to pursuing other interests.

134.   As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT II: DISCRIMINATION BASED ON RACE AND NATIONAL ORIGIN PURSUANT TO 42 U.S.C. § 1981

### All Named Plaintiffs and the Rule 23 Wage Class vs. All Defendants

135.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

136.   Plaintiffs are black and Jamaican and are within the class protected by Section 1981.

137.   Defendants Yellowstone and HSS are each an employer for purposes of Section 1981.

138.   Each of the Defendants employed Plaintiffs and those similarly situated.

139.   Each of the Defendants recruited the Plaintiffs for employment at Yellowstone, made representations to Plaintiffs about the terms and conditions of their employment, and entered into contracts acknowledging themselves as Plaintiffs' employer. Additionally, Defendants divided human resources and day-to-day supervision and management between the two of them.

140.   Both Defendants were joint employers of Plaintiffs. They shared control of the terms, conditions, and performance of their employment.

141.   Both Defendants created, condoned, and failed to prevent and correct a hostile work environment for Plaintiffs during their employment, because of their race and national origin.

142.   Both Defendants discriminated against Plaintiffs in the terms and conditions of their employment, including pay, because of their race and national origin.

143.   Creation of a hostile work environment and discrimination in terms and conditions of employment are adverse employment actions.

144.   Defendants did not create a hostile work environment for similarly situated, non-black, non-Jamaican employees and treated such employees more favorably than Plaintiffs and other black Jamaican employees.

145.   Defendants' actions described herein were intentional and taken with malice and with reckless indifference to Plaintiffs' federally protected rights.

146.   Defendants failed to take reasonable care to prevent and to correct the unlawful and discriminatory practices described herein.

147.   As a direct and proximate cause of Defendants' discriminatory actions and conduct, Plaintiffs have suffered, and will continue to suffer damages including, but not limited to, loss of salary, wages, earnings and benefits; diminution of future

earning capacity; loss of accumulated benefits; emotional distress and other compensatory damages in an amount to be determined at trial; punitive damages in an amount to be determined at trial; and attorneys' fees and costs.

### COUNT III: FAILURE TO PAY STATUTORILY REQUIRED WAGES PURSUANT TO MONT. CODE ANN. §§ 39-3-201 *ET SEQ.*

**Plaintiffs and the Rule 23 Class against All Defendants.**

148.    As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

149.    Defendants jointly employed Plaintiffs and those similarly situated.

150.    Defendants improperly withheld tips and service charges, which are considered wages pursuant to Mont. Code Ann. § 39-3-201, from Plaintiffs and those similarly situated.

151.    Defendants improperly made deductions from wages that were not part of the terms of employment from the pay of Plaintiffs and those similarly situated pursuant to Mont. Code Ann. § 39-3-204.

152.    Pursuant to Mont. Code Ann. §§ 39-3-201 *et seq.*, Plaintiffs and those similarly situated are entitled to damages, penalties, and attorney's fees for their unpaid wages.

## COUNT IV: FRAUD OR CONSTRUCTIVE FRAUD

## All Named Plaintiffs and the Rule 23 Wage Class vs. All Defendants

153.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

154.   Defendants made representations to Plaintiffs and those similarly situated regarding the terms and conditions of their employment at the Yellowstone Club, including that Yellowstone would be their only employer, that they would be well taken care of by Yellowstone, and that they would receive service charges and tips for their work.

155.   These representations were false.

156.   These representations were material.

157.   Defendants knew the representations were false or were ignorant of their truth.

158.   Defendants intended for the representations to be relied on.

159.   Plaintiffs and those similarly situated were ignorant of the falsity of the representations when they were made.

160.   Plaintiffs and those similarly situated relied on the representations.

161.   Plaintiffs and those similarly situated had a right to rely on the representations.

162.  As a proximate cause of their reliance on the representations, Plaintiffs and those similarly situated suffered damages, including illegally low pay.

<h2 style="text-align:center">COUNT V: NEGLIGENT MISREPRESENTATION</h2>

**All Named Plaintiffs and the Rule 23 Wage Class vs. All Defendants**

163.  As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

164.  Defendants made representations to Plaintiffs and those similarly situated regarding the terms and conditions of their employment at the Yellowstone Club, including that Yellowstone would be their only employer, that they would be well taken care of by Yellowstone, and that they would receive service charges and tips for their work.

165.  The representations were untrue.

166.  Defendants made these representations without any reasonable ground for believing them to be true.

167.  The representations were made with the intent to induce Plaintiffs and those similarly situated to rely on them.

168.  Plaintiffs and those similarly situated were unaware of the falsity of the representations when they were made; they acted in reliance upon the truth of the representations and Plaintiffs were justified in relying upon the representations.

169.   Plaintiffs and those similarly situated, as a result of their reliance, sustained damages, including illegally low pay.

## COUNT VI: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### All Named Plaintiffs and the Rule 23 Wage Class vs. All Defendants

170.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

171.   Defendants made representations to Plaintiffs and those similarly situated regarding the terms and conditions of their employment at the Yellowstone Club, including that Yellowstone would be their only employer, that they would be well taken care of by Yellowstone, and that they would receive service charges and tips for their work.

172.   Plaintiffs and those similarly situated reasonably believed they would be treated consistently with these representations.

173.   Plaintiffs and those similarly situated were not treated consistent with these representations and this constituted a breach of the covenant of good faith and fair dealing implied into the employment contracts of Plaintiffs and those similarly situated.

174.   As a result, Plaintiffs and those similarly situated suffered damages, including illegally low pay.

## DEMAND FOR JURY TRIAL

175. Plaintiffs demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

176. Plaintiffs respectfully request an Order and Judgment from this Court:

   a.   Certifying the Rule 23 Class, naming the named Plaintiffs as class representatives of the respective classes they seek to represent, and naming Plaintiffs' counsel class counsel;

   b.   granting judgment in favor of Plaintiffs and against all Defendants;

   c.   awarding Plaintiffs and the Rule 23 classes their actual damages and any applicable statutory damages;

   d.   awarding Plaintiffs and those similarly situated their costs;

   e.   awarding Plaintiffs and those similarly situated their attorneys' fees;

   f.   awarding Plaintiffs and members of the class all appropriate equitable and injunctive relief;

   g.   injunctive relief prohibiting Defendants from future discriminatory and illegal practices as described herein and requiring Defendants to adopt policies and procedures to eradicate the effects of past discriminatory and illegal practices;

h.      compensatory damages, including for emotional distress, as

allowed by law;

i.      punitive, exemplary, and liquidated damages as allowed by law;

j.      awarding Plaintiffs and those similarly situated prejudgment and

post-judgment interest, when allowable by law; and

k.      granting such other relief as this Court deems just and proper.

Respectfully Submitted,

s/Christopher C. Young
Christopher C. Young
YOUNG LAW OFFICE PLLC
P.O. Box 10247
Bozeman, Montana 59719
Phone:  406-587-2070
Fax:  866-403-0847
cyoung@younglawofficepllc.com
www.younglawofficepllc.com

David Seligman (*pro hac* forthcoming)
Towards Justice
1410 High St., Suite 300
Denver, CO 80218
Tel.: 720-248-8426
Fax: 303-957-2289
Email: david@towardsjustice.org

Mary Jo Lowrey (*pro hac* forthcoming)
1725 High Street, Suite 1
Denver, CO 80218
Phone: 303-593-2595
Fax: 303-502-9119
Email: maryjo@lowrey-parady.com

Attorneys for Plaintiffs

PLAINTIFFS' ADDRESS:
C/O Towards Justice
1410 High St., Suite 300
Denver, CO 80218