Sarah J. Parady
Lowrey Parady, LLC
1725 High Street
Denver, CO 80218
Phone: (303) 593-2595
Fax: (303) 502-9119
sarah@lowrey-parady.com

Christopher Young
YOUNG LAW OFFICE PLLC
P.O. Box 10247
Bozeman, MT 59719
Phone: (406) 587-2070
Fax: (866) 403-0847
cyoung@younglawofficepllc.com

David Seligman
Towards Justice
1410 High Street, Suite 300
Denver, CO 80218
Phone: (720) 239-2606
Fax: (303) 957-2289
david@towardsjustice.org
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BUTTE DIVISION

NICHOLAS DOUGLAS;
TASHEKA BRYAN;                          Civil Case No. CV 18-62-BU-SEH
JUNIOR HARRIS;
MARCUS RICHARDS;
STEPHANEY SMITH; and those
similarly situated,

      Plaintiffs,

v.

YELLOWSTONE CLUB
OPERATIONS, LLC; and
HOSPITALITY STAFFING
SOLUTIONS LLC,

           Defendants.

**FIRST AMENDED CLASS
ACTION COMPLAINT AND
JURY DEMAND**

## INTRODUCTION

1.     Plaintiffs are all black Jamaican citizens who spent the winter of 2017-2018 working in Montana as temporary non-immigrant H-2B visa workers. They worked at the Yellowstone Club, an ultra-exclusive golf and ski club that counts only the most elite as members.

2.     Plaintiffs came to Montana after promises that Yellowstone Club Operations, LLC would employ them, that they would be well taken care of as employees of this prestigious resort, and that they would receive ample pay, including tips and service charges that could amount to $400-$600 or more a night at the nicest restaurants.

3.     Instead, Plaintiffs found themselves jointly employed by a temp-staffing firm from Georgia, robbed of their tips and service charges, and with deductions taken from their pay that they never agreed to.

4.     All the while, Plaintiffs faced discrimination. They watched other workers at the club—who were not black or Jamaican—do the same work as them but be treated entirely differently. These other workers received higher rates of pay, tips

and service charges, better work assignments, and better treatment from their employers.

5.     Rather than the American opportunity promised, Plaintiffs winter in Montana was riddled with disappointment, illegally low pay, and discrimination.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under state law.

7.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Montana and because all Defendants are entities registered to do business in Montana.

## ADMINISTRATIVE EXHAUSTION

8.     On September 14, 2018, Plaintiffs Douglas, Bryan, Harris, Richards, and Smith timely filed their Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") based on race, color and national origin discrimination against Yellowstone Club Operations, LLC (Douglas Charge No. 541-2018-03338, Bryan Charge No. 541-2018-03339, Harris Charge No. 541-2018-03336, Richards Charge No. 541-2018-03334, and Smith Charge No. 541-2018-03342).

9.      On September 14, 2018, Plaintiffs Douglas, Bryan, Harris, Richards, and Smith timely filed their Charges of Discrimination with the EEOC based on race, color and national origin discrimination against Hospitality Staffing Solutions, LLC.  (Douglas Charge No. 541-2018-03337, Bryan Charge No. 541-2018-03340, Harris Charge No. 541-2018-03335, Richards Charge No. 541-2018-03333, and Smith Charge No. 541-2018-03341).

10.     On July 25, 2019, Plaintiffs Douglas, Bryan, Harris, Richards, and Smith received Notices of Right to Sue from the EEOC on their Charges of Discrimination against Yellowstone Club Operations, LLC (Douglas Charge No. 541-2018-03338, Bryan Charge No. 541-2018-03339, Harris Charge No. 541-2018-03336, Richards Charge No. 541-2018-03334, and Smith Charge No. 541-2018-03342).

11.     On July 26, 2019, Plaintiffs Douglas, Bryan, Harris, Richards, and Smith received Notices of Right to Sue from the EEOC on their Charges of Discrimination against Hospitality Staffing Solutions, LLC.  (Douglas Charge No. 541-2018-03337, Bryan Charge No. 541-2018-03340, Harris Charge No. 541-2018-03335, Richards Charge No. 541-2018-03333, and Smith Charge No. 541-2018-03341).

12.     Plaintiffs Douglas, Bryan, Harris, Richards, and Smith have administratively exhausted their claims against Defendants Yellowstone Club Operations, LLC and Hospitality Staffing Solutions, LLC under 42 U.S.C. § 2000e-5.

## PARTIES

13.     At all times material to the allegations of the complaint, Plaintiffs were natural persons who are Jamaican citizens and resided in Montana.

14.     At all times material to the allegations of the complaint, Defendant Yellowstone Club Operations, LLC (hereinafter "YCO") was a Montana Limited Liability Company with its principal place of business in Gallatin County, Montana.

15.     At all times material to the allegations of the complaint, Defendant Hospitality Staffing Solutions LLC (hereinafter "HSS") was a Georgia Limited Liability Company registered to do business in Montana.

## STATEMENT OF FACTS

**I.     Yellowstone Club Operations, LLC**

16.     The Yellowstone Club is a private ski and golf club located on 15,200 acres outside of Big Sky, Montana.

17.     YCO and its parents and subsidiaries own and operate the Yellowstone Club.

18.     YCO is responsible for the day to day operations of the Yellowstone Club.

19.    In order to be a member of the Yellowstone Club, one must pay an initiation fee, buy a home located on the club premises, and pay annual dues.

20.    In 2009, the New York Times reported that the club initiation fee was $250,000, homes cost between $5 million and $35 million, and annual dues were $20,000.

21.    Notable current and former members of the Yellowstone Club include: Bill Gates, Eric Schmidt, Peter Chernin, Steve Burke, Dan Quayle, Bill Frist, Ben Affleck and Jennifer Garner, Justin Timberlake and Jessica Biel, Warren Miller, Peter Berg, Tom Brady and Gisele Bündchen, Phil Mickelson, Greg LeMond, Hank Kashiwa, and Tom Weiskopf.

22.    During his time as a cook at the Yellowstone Club, Plaintiff Douglas believes he prepared meals for Bill Gates, Warren Buffet, and Mark Zuckerberg.

23.    YCO operates seven different restaurants at the Yellowstone Club serving its membership and their guests.

24.    YCO is also responsible for housekeeping for some residences at the club.

**II.    HSS**

25.    HSS is a nationwide staffing agency.

26.    Its corporate office is located in Atlanta, Georgia.

27.    On its website, HSS claims that "[t]hrough selective grass roots recruiting Hospitality Staffing Solutions ensures you receive motivated, attentive personnel.

To manage our greatest asset, Hospitality Staffing Solutions assigns each hotel, resort, or casino we serve with a supervisor as that property's point of contact. The supervisor recruits new talent, conducts new employee orientation, and functions as the day-to-day conduit between the property and Hospitality Staffing Solutions."

28.     HSS was hired by YCO to assist in recruiting, supervising, and administering Jamaican workers who worked as cooks, bartenders, servers, and housekeepers at the Yellowstone Club.

**III.   Plaintiffs' Employment by Defendants**

29.     Plaintiffs and those similarly situated are all black Jamaican citizens.

30.     The Jamaican Ministry of Labor maintains a pool of Jamaican workers interested in coming to the United States and providing temporary work under a non-immigrant visa.

31.     Plaintiffs and those similarly situated all registered to be part of this pool.

32.     YCO coordinated with the Jamaican Ministry of Labor to hold a recruiting event in Jamaica in or about the end of September 2017.

33.     YCO engaged HSS prior to this recruiting event.

34.     YCO and HSS jointly hosted the event.

35.     Approximately 500 Jamaicans attended the recruiting event.

36.     Cindy McPheeters was YCO's Director of Human Resources at the time of the recruiting event.

37.     Ms. McPheeters led the event.

38.     Also present at the event were several other persons claiming to be agents of

YCO, including an executive chef, a chef de cuisine, and a man named Tim.

39.     At the meeting, Tim identified himself as an agent of YCO, even wearing

clothes with YCO's logo on them.

40.     Plaintiffs later learned that Tim actually worked for HSS.

41.     Upon information and belief, "Tim" is HSS CEO Tim McPherson.

42.     At the beginning of the recruiting event, Ms. McPheeters addressed the

entire group of potential recruits.

43.     She described YCO as the only employer for anyone hired as a visa

employee and described the Yellowstone Club as a desirable place to work,

prestigious, populated by famous people, and as a "cream of the crop" location.

44.     Ms. McPheeters also made representations regarding YCO being a good

employer. In particular, with regard to pay and working conditions, Ms.

McPheeters assured the workers that they would be paid well, treated well, and

"well taken care of."

45.     Ms. McPheeters made representations regarding tips and service charges

when presenting to all of the potential recruits. In response to a question regarding

tips and gratuities, which are generally available in Jamaica to workers in the

hospitality industry, but not in all other countries, she told all of the workers they

would be entitled to service charges and tips on top of their hourly pay "across the board."

46.    Bartenders and servers also received written job descriptions at this meeting that promised that they would receive tips.

47.    Plaintiffs relied on these representations in eventually deciding to work for YCO.

48.    YCO made these representations with the sole purpose of inducing the workers to work for YCO.

49.    Interviews followed the presentation to the larger group of recruits.

50.    After interviews, YCO selected approximately 110 workers to work for the Yellowstone Club in Montana on H-2B visas as cooks, servers, bartenders, and housekeepers.

51.    Every person hired as an H-2B worker was a black Jamaican.

52.    Plaintiff Douglas was hired as a cook.

53.    Plaintiff Bryan was hired as a bartender.

54.    Plaintiff Harris was hired as a server.

55.    Plaintiff Richards was hired as a server.

56.    Plaintiff Smith was hired as a housekeeper.

57.    A few weeks after the recruiting event, in approximately October or early November 2017, YCO sent documents to the Jamaican Ministry of Labor by

interstate wire or mail for Plaintiffs and those similarly situated to use to secure their visas at the U.S. Embassy in Jamaica.

58.     Plaintiffs and those similarly situated took documents that looked like contracts from the Ministry of Labor, brought them to the U.S. Embassy, and secured their visas.

59.     The documents that were taken to the ministry of labor described the employer as only YCO.

60.     When they returned from the Embassy, the documents were taken from them and a contract, transmitted by Defendants to the Ministry of Labor by interstate wire or mail, was provided for them to sign describing HSS as a party for the first time.

61.     The Applications for Temporary Employment Certification submitted to, and approved by, the United States Department of Labor listed YCO alone as the employer and promised tips to bartenders and servers. They are attached to this Complaint as Exhibits 1, 2, 3, and 4.

62.     These certifications had been transmitted to the United States Department of Labor for approval via interstate wire or mail and were subsequently approved with a signature by the United States Department of Labor.

63.     The United States Department of Labor relied on the information in the certifications in approving them.

64.    Plaintiffs and those similarly situated left Jamaica for the Yellowstone Club at the end of November or early December 2017.

65.    After reaching the Yellowstone Club, Plaintiffs and those similarly situated learned almost immediately that HSS would also play a role in their employment.

66.    When Plaintiffs and those similarly situated arrived in Montana, there was a meeting where an agent of HSS described pay to the bartenders, cooks, and servers, described the work, and assured the workers that they would receive tips and service charges.

67.    Soon after arriving in Montana, HSS provided an employee handbook to Plaintiffs and those similarly situated stating that HSS *alone* was their employer.

68.    The handbook includes the following admonitions:

> I Understand that I **am an employee of HSS and am on assignment. I am not an employee of the client or property where I am placed to work.**
>
> …
>
> I understand that **HSS**, not the client and or property, **will determine and communicate my rate and any other pay** to me, as well as any information about HSS **benefits** to which I may be entitled.
>
> …
>
> I understand that I am **prohibited from participating in client benefits** or being deemed an employee of client properties **regardless of the number of hours** I work as a leased/contracted/ temporary employee of HSS.

(emphases in original).

69.     But the contracts signed by Plaintiffs and those similarly situated describe YCO as the employer, with the employment "managed in partnership with [HSS]."

70.     In reality, both YCO and HSS employed Plaintiffs. YCO controlled the daily work of Plaintiffs and those similarly situated, while pay and human resources were managed by HSS.

71.     YCO employees supervised Plaintiffs and those similarly situated in their work each day.

72.     YCO determined the workers' day-to-day job duties, work assignments, and schedules, including the total amount of hours they were assigned and thus the total amount of pay they earned.

73.     YCO (through its Human Resources Director Ms. McPheeters) took complaints from the black Jamaican H-2B workers about the differences in their pay as compared to other employees; represented to them that YCO was contracting with another resort to secure them employment after their seasonal roles at Yellowstone Club ended for the year; made representations to them about future employment at YCO; and spoke to them about bonuses including representing to them that YCO had made the decision to pay them bonuses.

74.     As an H-2B visa employer, YCO was legally obligated to pay wages to Plaintiffs and those similarly situated.

12

75.     As an H-2B visa employer, YCO was legally obligated to provide Plaintiffs and those similarly situated with visa fees and transport to and from the United Sates.

76.     YCO determined the period of the workers' employment through the visa process.

77.     HSS had agents on site at the Yellowstone Club to help provide pay and human resources services.

78.     HSS provided Plaintiffs and those similarly situated with an "Open Door" policy and an EEO policy and handled matters related to timekeeping and payroll.

79.     Although HSS paid Plaintiffs and those similarly situated, YCO directed these payments.

80.     For example, YCO directed HSS to pay bonuses to Plaintiffs and those similarly situated.

81.     YCO and HSS were jointly responsible for providing Plaintiffs and those similarly situated with transportation and housing.

82.     Plaintiffs and those similarly situated worked for Defendants at the Yellowstone Club until late March or April of 2018.

**IV.    Discrimination**

83.    All of the H-2B workers employed at the Yellowstone Club during the

winter of 2017-2018 (that is, Plaintiffs and those similarly situated) were black

Jamaicans.

84.    YCO employed some 1,200 workers at the Yellowstone Club in the winter

of 2017-2018.

85.    Other than Plaintiffs and those similarly situated, no more than a handful of

other black servers, cooks, housekeepers, or bartenders worked at the Yellowstone

Club during the winter of 2017-2018.

86.    Other than Plaintiffs and those similarly situated, no more than one other

black Jamaican or Jamaican of any race worked at the Yellowstone Club in any

capacity during the winter of 2017-2018.

87.    In addition to Plaintiffs and those similarly situated, YCO employed about

1,200 other workers in the winter of 2017-2018.

88.    As black Jamaican H-2B workers, Plaintiffs and those similarly situated

were paid less for the same work as compared to non-black, non-Jamaican, non-H-

2B workers.

89.    For example, black Jamaican H-2B cooks were paid $12 per hour, while

non-black, non-Jamaican, non-H-2B cooks were paid $15 to $18 per hour.

90.     When Plaintiffs demanded additional pay to equate their pay with other

workers at the Yellowstone Club doing the same or similar work, YCO and HSS

refused.

91.     Defendants also withheld service charges and tips from black Jamaican H-

2B workers, while allowing non-black, non-Jamaican, non-H-2B workers doing

the same or similar work to receive tips and service charges.

92.     Cooks, like Plaintiff Douglas, were supposed to receive a percentage of the

revenue for all food prepared in the kitchen as a service charge. Black Jamaican H-

2B cooks did not receive these service charges. Non-black, non-Jamaican, non-H-

2B cooks did receive these service charges.

93.     Servers, like Plaintiffs Harris and Richards, were supposed to receive a

percentage of the revenue for all food and drink they served as a service charge or

normal tips. Black Jamaican H-2B servers did not receive these service charges

and tips. Non-black, non-Jamaican, non-H-2B servers did receive this additional

compensation.

94.     At Plaintiff Harris's restaurant, servers could print out a receipt of their

gratuity each night. Service charges were a fixed percentage of the bill for each

table served. Plaintiff Harris's receipts reflected a service charge of 20% of the bill,

which was thousands of dollars over the course of the season. Black Jamaican H-

2B servers never received these service charges, while non-black, non-Jamaican, non-H-2B servers did.

95.    Bartenders, like Plaintiff Bryan, were supposed to receive a service charge equal to a percentage of the price of the drinks and food served by each bartender. Black Jamaican H-2B bartenders never received these service charge, while non-black, non-Jamaican, non-H-2B bartenders did.

96.    Housekeepers, like Plaintiff Smith, were supposed to receive pooled tips and service charges as additional compensation. Black Jamaican H-2B housekeepers did not receive these tips. Non-black, non-Jamaican, non-H-2B housekeepers did receive this additional compensation.

97.    The entirety of the money collected from Yellowstone Club guests as tips and service charges was simply distributed among non-Black, non-Jamaican, non-H-2B workers.

98.    In the alternative, on information and belief, YCO retained tips and service charges paid by Yellowstone Club guests as tips and service charges that would otherwise have been paid to Plaintiffs and those similarly situated.

99.    YCO and HSS had a policy of paying H-2B workers at lower rates than non-H-2B workers (the "Wage Rate Policy").

100.   YCO and HSS had a policy of allowing only non-H-2B workers to retain tips and service charges (the "Tip Policy").

101.   YCO and HSS had a policy of making illegal deductions only from H-2B workers' pay (the "Deduction Policy").

102.   YCO had a policy of only utilizing a subcontractor (HSS) to handle payroll for H-2B workers, and not for non-H-2B workers (the "Payroll Policy").

103.   YCO and HSS could easily have remitted tips and service charges to Plaintiffs and those similarly situated.

104.   YCO could easily have paid Plaintiffs and those similarly situated through the same payroll system used for other employees, instead of through HSS.

105.   YCO and HSS had no legitimate business justification for failing to remit tips and service charges to Plaintiffs and those similarly situated.

106.   YCO had no legitimate business justification for relying on HSS to provide payroll and human resources services to the H-2B workers when it already provided those services to all of its other employees. In fact, YCO told Plaintiffs it intended to employ H-2B workers directly for the following season without utilizing HSS.

107.   In the 2018-2019 winter season, YCO employed H-2B workers directly.

108.   Plaintiffs, and other black Jamaican H-2B servers, cooks, and bartenders, complained about not receiving the same pay as their non-black, non-Jamaican, non-H-2B coworkers.

109.   There was a meeting between HSS CEO Tim McPherson and the Jamaican servers, cooks, and bartenders in the middle of the ski season after Defendants received complaints that black Jamaican H-2B workers were not receiving the same compensation as non-black, non-Jamaican, non-H-2B workers. In that meeting, Mr. McPherson stated that black Jamaican H-2B would not receive tips and service charges because "[they] were not from here."

110.   After that meeting, a member of HSS human resources named Fay Wilson threatened a black Jamaican server who had complained during the meeting about his compensation, saying that he could always be "taken back to Jamaica."

111.   About two months before the end of their work, the black Jamaican H-2B housekeepers asked YCO and HSS once again about their missing tips and service charges. There was a meeting between the black Jamaican H-2B housekeepers, Sheldon Brown (who Plaintiffs believe was a Jamaican government official), Tim McPherson from HSS, Fay Wilson from HSS, and Amy Hager from YCO. The housekeepers were reassured that they would get their tips and service charges.

112.   The black Jamaican H-2B housekeepers continued to work in reliance on this promise.

113.   However, the black Jamaican H-2B housekeepers did not receive any tips or service charges at the end of their employment, though some received a "bonus" that was unrelated to the unpaid tips and service charges.

114.   In approximately March 2018, Cindy McPheeters, representing YCO, addressed the black Jamaican H-2B workers about not receiving service charges and tips. She promised the black Jamaican H-2B workers that YCO would give them bonuses. Some (but not all) of the Plaintiffs and those similarly situated received "bonuses" that ranged from modest amounts to about $2,000.

115.   HSS took deductions from some of these "bonuses." In some cases, the deductions were equal in amount to the entire "bonus," leaving the worker to receive nothing.

116.   Black Jamaican H-2B workers also experienced discrimination in the allocation of job duties.

117.   For example, Plaintiff Douglas was required to clean fryers while non-black, non-Jamaican, and non-H-2B cooks were not required to do this dangerous and unpleasant job.

118.   As another example, black Jamaican H-2B servers were not scheduled to work special functions at the Yellowstone Club or were given this work only if no non-black, non-Jamaican workers were available, while non-black, non-Jamaican, non-H-2B servers were scheduled and given preference for this work. The pay for these special functions was higher than the typical pay and therefore Plaintiffs and those similarly situated were denied the chance to receive higher compensation by being denied work at these special functions.

119.   As another example, Plaintiff Richards was a server at a low-end Yellowstone Club restaurant that specifically catered to children, resulting in lower overall meal costs. Non-black, non-Jamaican, non-H-2B servers did not want to work at this restaurant because they would not receive as much compensation in tips as they could receive at a more expensive restaurant. As a result, only black Jamaican H-2B servers were assigned to this restaurant.

120.   Black Jamaican H-2B workers also received more scrutiny about their sick time and work hours.

121.   For example, Plaintiff Douglas was late to work one day because of a medical issue, and he was chastised harshly by Dan, the sous chef, who said, "I don't give a fuck [about your medical issue.] Make sure you are at work." Non-black, non-Jamaican, and non-H-2B workers came in late or were missing from their chef stations but did not get in trouble.

122.   Plaintiffs and those similarly situated also suffered discrimination in their commute between their lodging and work.

123.   For example, black Jamaican H-2B workers were denied transportation on Yellowstone Club employee shuttles. One shuttle driver named Matt, an agent of YCO, refused to allow black Jamaican H-2B workers to ride his hourly shuttle to and from the nearby town of Big Sky. Matt claimed that the Yellowstone Club

policy was to refuse to take black Jamaican H-2B workers back to town on the shuttle because they were Jamaican.

124.   On another occasion, Plaintiff Douglas was told by Matt that black Jamaicans should "speak English" when they rode the bus, or he would "run this fucking bus over the cliff."

## V.   Defendants' Illegal Pay Practices

125.   During their employment at the Yellowstone Club, Plaintiffs and those similarly situated suffered from illegal pay practices implemented by Defendants which caused Plaintiffs and those similarly situated to be paid illegally low wages.

### A. Illegal Withholding of Tips, Service Charges, or Other Gratuities (the "Tip Policy")

126.   Members and guests using YCO restaurants and accommodations pay service charges and tips.

127.   Once in the United States, it became clear to Plaintiffs and those similarly situated that other workers were receiving tips and service charges—a fixed percentage added to the charge for a service—paid by Yellowstone Club members and guests, while black Jamaican H-2B workers were not.

128.   Defendants withheld tips and service charges paid by members and guests from Plaintiffs and those similarly situated.

129.   Servers in Plaintiff Harris's restaurant could get a receipt each night showing the tips and service charges they had accrued that day. Some of Plaintiff Harris's receipts are attached to this complaint as Exhibit 5.

130.   Plaintiff Harris, like all Plaintiffs and those similarly situated, did not receive the tips and service charges reported on these receipts.

131.   In Montana, service charges and tips are wages. *See* Mont. Code Ann. § 39-3-201.

132.   Moreover, Montana law requires that all tips and service charges be distributed directly to nonmanagement employees.

133.   Defendants failed to distribute all tips and service charges to nonmanagement employees.

134.   Instead, Defendants either illegally kept a portion of the tips and service charges or distributed a portion of the tips and service charges to management.

### B. Illegal Pay Deductions (the "Deduction Policy")

135.   YCO and HSS provided housing to Plaintiffs and those similarly situated.

136.   By agreement, a deduction for housing of $75.00 per week, not to exceed $300.00 per month, was taken from the pay of Plaintiffs and those similarly situated.

137.   This was the only deduction from the pay of Plaintiffs' and those similarly situated that was part of their terms of employment and therefore the only deduction permitted under Montana law.

138.   Despite this, HSS and YCO also made deductions for purported damages to the employer-provided housing and for plane tickets. YCO admitted to some of these deductions in an email attached as Exhibit 6, but simply blamed HSS and otherwise did nothing to correct the underpayment.

### C. Complaints

139.   Plaintiffs and those similarly situated complained repeatedly to both Defendants about these illegal pay practices.

140.   Each Defendant blamed the other, with YCO claiming HSS was responsible for payroll and HSS claiming the decisions governing payroll were being made by YCO.

141.   Those who complained were threatened with being sent back to Jamaica if the complaints continued.

## VI.   RICO Allegations

### A. The Enterprise

142.   YCO and HSS formed an association-in-fact called the "Enterprise."

143.   YCO and HSS formed this enterprise for the purpose of fraudulently inducing foreign H-2B labor to work at the Yellowstone Club and then benefiting from that fraud during the course of their employment.

## B. Racketeering Activities

144.   Using the Enterprise, YCO and HSS participated in a fraudulent scheme to induce Jamaican workers to work at the Yellowstone Club by making false representations to the workers in Jamaica, false representations to the Jamaican Ministry of Labor, and false representations to the United States Department of Labor regarding the terms and conditions of employment at the Yellowstone Club.

145.   The false representations included (1) promises of Plaintiffs and those similarly situated receiving tips and service charges when Defendants knew they would not; (2) promises of employment by YCO alone and that YCO would be a prestigious place to work and take good care of Plaintiffs and those similarly situated, when Defendants knew that HSS would also employ Plaintiffs and those similarly situated and implement illegal pay policies adversely affecting Plaintiffs and those similarly situated; and (3) promises to the Jamaican Ministry of Labor and the U.S. Department of Labor that YCO alone would employ Plaintiffs and those similarly situated, which induced those government agencies to facilitate the employment of Plaintiffs and those similarly situated.

146.   All of these fraudulent statements constituted fraud in foreign labor contracting pursuant to 18 U.S.C. § 1351.

147.   Moreover, sending the documents in furtherance of this fraud to the United States Department of Labor, the Jamaican Ministry of Labor, and to Plaintiffs and

those similarly situated constituted wire and mail fraud pursuant to 18 U.S.C. §

1341 and 18 U.S.C. § 1343.

### C. Defendants' Fraud Caused Damage to Plaintiffs' Money and Property

148.   Plaintiffs relied to their detriment on the misrepresentations made to them by

YCO and HSS regarding YCO being a good employer and their sole employer, and

regarding the availability of service charges and tips.

149.   YCO and HSS knowingly made these false statements to Plaintiffs and those

similarly situated, the United States Department of Labor, and the Jamaican

Ministry of Labor for the sole purpose of inducing Plaintiffs and those similarly

situated to work for YCO and HSS.

150.   The fraudulent representations caused Plaintiffs to lose money and property

by inducing them to work for employers who offered service charges and tips,

accepted service charges and tips from members and guests on the workers' behalf,

and, despite this, illegally withheld service charges and tips.

151.   The only persons harmed by these misrepresentations were Plaintiffs and

those similarly situated, whose tips and service charges were illegally withheld and

who experienced illegal deductions from their pay.

### RULE 23 CLASS ALLEGATIONS

152.   Plaintiffs allege all claims as a Fed R. Civ P. 23 class action on their own

behalf and on behalf of the class for which they seek certification.

153.   Pending any modifications necessitated by discovery, Plaintiffs preliminarily

define the "Rule 23 Class" as follows:

> ALL EMPLOYEES OF YCO AND HSS WHO
> WORKED AT THE YELLOWSTONE CLUB ON
> NON-IMMIGRANT VISAS DURING THE WINTER
> OF 2017-2018

154.   The classes are so numerous that joinder of all potential class members is

impracticable.  Plaintiffs do not know the exact size of the classes since that

information is within the control of Defendants. However, Plaintiffs estimate that,

based on the labor certifications submitted by YCO to the United States

Department of Labor, the class is composed of approximately 110 persons. The

exact size of the class will be easily ascertainable from Defendants' records.

155.   There are questions of law or fact common to the classes that predominate

over any individual issues that might exist. Common questions of law and fact

include: Defendants' pay practices; Defendants' failure to pay employees all they

are legally owed; the nature and extent of Defendants' fraud; and the nature and

extent of Defendants' discrimination toward black Jamaican H-2B workers.

156.   The class claims asserted by Plaintiffs are typical of the claims of all the

potential class members because they experienced the same or similar working

conditions and pay practices as Defendants' other employees. A class action is

superior to other available methods for the fair and efficient adjudication of this

controversy because numerous identical lawsuits alleging similar or identical

causes of action would not serve the interests of judicial economy. This is especially true in the case of low-wage, hourly, H-2B temporary workers, like the class members here, who are unsophisticated, are unlikely to seek legal representation, cannot realistically navigate the legal system pro se, and whose small claims make it difficult to retain legal representation if they do seek it.

157.   Plaintiffs will fairly and adequately protect and represent the interests of the class. They were Defendants' employees and were victims of the same violations of law as the other class members, including numerous violations of federal and state laws.

158.   Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in wage and hour class actions.

159.   The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

160.   Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and that the pertinent federal and state laws are appropriate

vehicles to vindicate the rights of those employees with small claims as part of the larger class.

161.  Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

162.  Plaintiffs are unaware of any pending litigation commenced by members of the classes concerning the instant controversy.

163.  It is desirable to concentrate this litigation in this forum because all Defendants are registered to do business in this district and the acts and omissions giving rise to this action largely occurred in this district or on foreign soil.

164.  This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage claims to both class litigation and the use of representative testimony and representative documentary evidence.

165.  The contours of the class will be easily defined by reference to the payroll documents Defendants were legally required to create and maintain.

## <u>COUNT I</u>: CIVIL RICO, 18 U.S.C. 1964(c)

### Plaintiffs and the Rule 23 Class vs. All Defendants

166.  As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

167.   Defendants YCO and HSS violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

168.   Defendants YCO, HSS, and the Enterprise engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate the fraud in foreign labor contracting statute (18 U.S.C. § 1351) and the mail and wire fraud statutes (18 U.S.C. § 1341 and 18 U.S.C. § 1343).

169.   By conducting the Enterprise through a pattern of racketeering, Defendants YCO and HSS caused the injury of Plaintiffs and those similarly situated.

170.   Among other things, each of these RICO violations caused Plaintiffs and those similarly situated to work without receiving the tips and service charges they were promised, to suffer loss of past, current, and prospective wages and to spend unpaid time working as opposed to pursuing other interests.

171.   As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT II: DISCRIMINATION BASED ON RACE AND NATIONAL ORIGIN PURSUANT TO 42 U.S.C. § 1981

### All Named Plaintiffs and the Rule 23 Class vs. All Defendants

172.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

173.   Plaintiffs are black and Jamaican and are within the class protected by Section 1981.

174.   Defendants YCO and HSS are each an employer for purposes of Section 1981.

175.   Each of the Defendants employed Plaintiffs and those similarly situated.

176.   Each of the Defendants recruited the Plaintiffs for employment at the Yellowstone Club, made representations to Plaintiffs about the terms and conditions of their employment, and entered into contracts acknowledging themselves as Plaintiffs' employer. Additionally, Defendants divided human resources and day-to-day supervision and management between the two of them.

177.   Both Defendants were joint employers of Plaintiffs. They shared control of the terms, conditions, and performance of their employment.

178.   Both Defendants created, condoned, and failed to prevent and correct a hostile work environment for Plaintiffs during their employment, because of their race and national origin.

179.   Both Defendants discriminated against Plaintiffs in the terms and conditions of their employment, including pay and specifically including in their wage rates, receipt of tips and service charges, and in the application of deductions, because of their race and national origin.

180.   Creation of a hostile work environment and discrimination in terms and conditions of employment are adverse employment actions.

181.   Defendants did not create a hostile work environment for similarly situated, non-black, non-Jamaican employees and treated such employees more favorably than Plaintiffs and other black Jamaican employees.

182.   Defendants' actions described herein were intentional and taken with malice and with reckless indifference to Plaintiffs' federally protected rights.

183.   Defendants failed to take reasonable care to prevent and to correct the unlawful and discriminatory practices described herein.

184.   As a direct and proximate cause of Defendants' discriminatory actions and conduct, Plaintiffs have suffered, and will continue to suffer damages including, but not limited to, loss of salary, wages, earnings and benefits; diminution of future earning capacity; loss of accumulated benefits; emotional distress and other compensatory damages in an amount to be determined at trial; punitive damages in an amount to be determined at trial; and attorneys' fees and costs.

## COUNT III: FAILURE TO PAY STATUTORILY REQUIRED WAGES PURSUANT TO MONT. CODE ANN. §§ 39-3-201 *ET SEQ.*

### Plaintiffs and the Rule 23 Class against All Defendants.

185.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

186.   Defendants jointly employed Plaintiffs and those similarly situated.

187.   Defendants improperly withheld tips and service charges, which are considered wages pursuant to Mont. Code Ann. § 39-3-201, from Plaintiffs and those similarly situated.

188.   Defendants improperly made deductions from wages that were not part of the terms of employment from the pay of Plaintiffs and those similarly situated pursuant to Mont. Code Ann. § 39-3-204.

189.   Pursuant to Mont. Code Ann. §§ 39-3-201 *et seq.*, Plaintiffs and those similarly situated are entitled to damages, penalties, and attorney's fees for their unpaid wages.

## COUNT IV: FRAUD OR CONSTRUCTIVE FRAUD

### All Named Plaintiffs and the Rule 23 Class vs. All Defendants

190.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

191.   Defendants made representations to Plaintiffs and those similarly situated regarding the terms and conditions of their employment at the Yellowstone Club, including that YCO would be their only employer, that they would be well taken care of by YCO, and that they would receive service charges and tips for their work.

192.   These representations were false.

193.   These representations were material.

194.   Defendants knew the representations were false or were ignorant of their truth.

195.   Defendants intended for the representations to be relied on.

196.   Plaintiffs and those similarly situated were ignorant of the falsity of the representations when they were made.

197.   Plaintiffs and those similarly situated relied on the representations.

198.   Plaintiffs and those similarly situated had a right to rely on the representations.

199.   As a proximate cause of their reliance on the representations, Plaintiffs and those similarly situated suffered damages, including illegally low pay.

<u>COUNT V:</u> <strong>NEGLIGENT MISREPRESENTATION</strong>

<strong>All Named Plaintiffs and the Rule 23 Class vs. All Defendants</strong>

200.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

201.   Defendants made representations to Plaintiffs and those similarly situated regarding the terms and conditions of their employment at the Yellowstone Club, including that YCO would be their only employer, that they would be well taken care of by YCO, and that they would receive service charges and tips for their work.

202.   The representations were untrue.

203.   Defendants made these representations without any reasonable ground for believing them to be true.

204.   The representations were made with the intent to induce Plaintiffs and those similarly situated to rely on them.

205.   Plaintiffs and those similarly situated were unaware of the falsity of the representations when they were made; they acted in reliance upon the truth of the representations and Plaintiffs were justified in relying upon the representations.

206.   Plaintiffs and those similarly situated, as a result of their reliance, sustained damages, including illegally low pay.

## COUNT VI: BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### All Named Plaintiffs and the Rule 23 Class vs. All Defendants

207.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

208.   Defendants made representations to Plaintiffs and those similarly situated regarding the terms and conditions of their employment at the Yellowstone Club, including that YCO would be their only employer, that they would be well taken care of by YCO, and that they would receive service charges and tips for their work.

209.   Plaintiffs and those similarly situated reasonably believed they would be treated consistently with these representations.

210.   Plaintiffs and those similarly situated were not treated consistent with these representations and this constituted a breach of the covenant of good faith and fair dealing implied into the employment contracts of Plaintiffs and those similarly situated.

211.   As a result, Plaintiffs and those similarly situated suffered damages, including illegally low pay.

### COUNT VI: DISPARATE TREATMENT BASED ON RACE AND NATIONAL ORIGIN PURSUANT TO TITLE VII

### All Named Plaintiffs and the Rule 23 Class vs. All Defendants

212.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

213.   Plaintiffs are black and Jamaican and are within the class protected by Title VII.

214.   Defendants YCO and HSS are each an employer for purposes of Title VII.

215.   Each of the Defendants employed Plaintiffs and those similarly situated.

216.   Each of the Defendants recruited the Plaintiffs for employment at the Yellowstone Club, made representations to Plaintiffs about the terms and conditions of their employment, and entered into contracts acknowledging themselves as Plaintiffs' employer. Additionally, Defendants divided human resources and day-to-day supervision and management between the two of them.

217.   Both Defendants were joint employers of Plaintiffs. They shared control of the terms, conditions, and performance of their employment.

218.   Both Defendants created, condoned, and failed to prevent and correct a hostile work environment for Plaintiffs during their employment, because of their race and national origin.

219.   Both Defendants discriminated against Plaintiffs in the terms and conditions of their employment, including pay, and specifically including in their wage rates, receipt of tips and service charges, and in the application of deductions, because of their race and national origin.

220.   Creation of a hostile work environment and discrimination in terms and conditions of employment are adverse employment actions.

221.   Defendants did not create a hostile work environment for similarly situated, non-black, non-Jamaican employees and treated such employees more favorably than Plaintiffs and other black Jamaican employees.

222.   Defendants' actions described herein were intentional and taken with malice and with reckless indifference to Plaintiffs' federally protected rights.

223.   Defendants failed to take reasonable care to prevent and to correct the unlawful and discriminatory practices described herein.

224.   As a direct and proximate cause of Defendants' discriminatory actions and conduct, Plaintiffs have suffered, and will continue to suffer damages including,

but not limited to, loss of salary, wages, earnings and benefits; diminution of future earning capacity; loss of accumulated benefits; emotional distress and other compensatory damages in an amount to be determined at trial; punitive damages in an amount to be determined at trial; and attorneys' fees and costs.

## COUNT VII: DISPARATE IMPACT BASED ON RACE AND NATIONAL ORIGIN PURSUANT TO TITLE VII

### All Named Plaintiffs and the Rule 23 Class vs. All Defendants

225.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

226.   Plaintiffs are black and Jamaican and are within the class protected by Title VII.

227.   Defendants YCO and HSS are each an employer for purposes of Title VII.

228.   Each of the Defendants employed Plaintiffs and those similarly situated.

229.   Each of the Defendants recruited the Plaintiffs for employment at the Yellowstone Club, made representations to Plaintiffs about the terms and conditions of their employment, and entered into contracts acknowledging themselves as Plaintiffs' employer. Additionally, Defendants divided human resources and day-to-day supervision and management between the two of them.

230.   Both Defendants were joint employers of Plaintiffs. They shared control of the terms, conditions, and performance of their employment.

231.  Both Defendants adopted specific policies and practices that significantly disparately impacted Plaintiffs based on their race and national origin.

232.  These policies and practices included the Wage Rate Policy, Tip Policy, Deduction Policy, and Payroll Policy.

233.  Defendants had no legitimate business justification for these policies and practices.

234.  One or more alternate practices without a significant disparate impact would equally have met Defendants' business needs.

235.  Alternate practices include: paying all workers through the YCO payroll system; paying tips and service charges to all workers; paying workers in the same positions at the same hourly rates; prohibiting pay deductions for all workers.

236.  Defendants' actions described herein were intentional and taken with malice and with reckless indifference to Plaintiffs' federally protected rights.

237.  Defendants failed to take reasonable care to prevent and to correct the unlawful and discriminatory practices described herein.

238.  As a direct and proximate cause of Defendants' discriminatory actions and conduct, Plaintiffs have suffered, and will continue to suffer damages including, but not limited to, loss of salary, wages, earnings and benefits; diminution of future earning capacity; loss of accumulated benefits; emotional distress and other

compensatory damages in an amount to be determined at trial; punitive damages in an amount to be determined at trial; and attorneys' fees and costs.

## COUNT VIII: BREACH OF FIDUCIARY DUTY

### All Named Plaintiffs and the Rule 23 Class vs. YCO

239.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

240.   At all relevant times, YCO had a policy of including service charges as a percentage of total charges for services provided to members and guests.

241.   During the relevant time period, Service charges were paid to YCO or its agents by members and guests.

242.   Every time a member or guest paid a service charge an express or resulting trust was created for the benefit of all nonmanagement employees involved in providing the services.

243.   As a result of the creation of the express or resulting trusts, YCO had a fiduciary duty to Plaintiffs and those similarly situated.

244.   YCO breached this fiduciary duty by failing to distribute the service charges to Plaintiffs and those similarly situated.

245.   As a result, Plaintiffs and those similarly situated suffered damages.

## COUNT VIII: CONVERSION

### All Named Plaintiffs and the Rule 23 Class vs. YCO

246.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

247.   At all relevant times, YCO had a policy of including service charges as a percentage of total charges for services provided to members and guests.

248.   During the relevant time period, service charges were paid to YCO or its agents by members and guests.

249.   Service charges paid by members and guests were the personal property of Plaintiffs and those similarly situated when paid by the members and guests.

250.   Plaintiffs and those similarly situated had a right to possess the service charges and YCO deprived them of that right.

251.   By failing to distribute the service charges to Plaintiffs and those similarly situated, YCO took unauthorized control over the service charges.

252.   Plaintiffs and those similarly situated suffered damages.

## <u>COUNT IX</u>: THIRD PARTY BENEFICIARY TO CONTRACT
### All Named Plaintiffs and the Rule 23 Class vs. HSS

253.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

254.   YCO and HSS entered into a contract that included a provision barring HSS from deducting any amounts, other than required employment taxes, from year-end bonuses paid by YCO to Plaintiffs through HSS.

255.   This provision was intended to benefit Plaintiffs and those similarly situated.

256.   YCO paid season-end bonuses to Plaintiffs through HSS for the 2017-2018 season.

257.   In violation of its contract with YCC, HSS made deductions from the season-end bonuses other than required employment taxes before disbursing the bonuses to Plaintiffs and those similarly situated.

258.   These deductions caused damages to Plaintiffs and those similarly situated.

## COUNT X: NEGLIGENCE PER SE FOR THEFT AND THEFT OF LABOR
### All Named Plaintiffs and the Rule 23 Class vs. All Defendants

259.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

260.   Mont. Code Ann. § 45-6-305 bars the temporary use of labor or services by use of threat or deceit. Mont. Code Ann. § 45-6-301 prohibits theft.

261.   By fraudulently recruiting Plaintiffs and those similarly situated and then failing to pay promised wages, including service charges, Defendants committed theft of labor and theft.

262.   This injured Plaintiffs and those similarly situated.

263.   These statutes were enacted to protect Plaintiffs and those similarly situated.

264.   The injury to Plaintiffs and those similarly situated is the sort that the statutes were enacted to prevent.

265.   The statutes were intended to regulate the activities of Defendants.

266.   The theft caused damages to Plaintiffs and those similarly situated.

## DEMAND FOR JURY TRIAL

267.   Plaintiffs demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

268.   Plaintiffs respectfully request an Order and Judgment from this Court:

a.   Certifying the Rule 23 Class, naming the named Plaintiffs as class representatives of the respective classes they seek to represent, and naming Plaintiffs' counsel class counsel;

b.   granting judgment in favor of Plaintiffs and against all Defendants;

c.   awarding Plaintiffs and the Rule 23 classes their actual damages and any applicable statutory damages;

d.   awarding Plaintiffs and those similarly situated their costs;

e.   awarding Plaintiffs and those similarly situated their attorneys' fees;

f.   awarding Plaintiffs and members of the class all appropriate equitable and injunctive relief;

g.   injunctive relief prohibiting Defendants from future discriminatory and illegal practices as described herein and requiring Defendants

to adopt policies and procedures to eradicate the effects of past

discriminatory and illegal practices;

h.     compensatory damages, including for emotional distress, as

allowed by law;

i.     punitive, exemplary, and liquidated damages as allowed by law;

j.     awarding Plaintiffs and those similarly situated prejudgment and

post-judgment interest, when allowable by law; and

k.     granting such other relief as this Court deems just and proper.

Respectfully submitted this 18th day of October, 2019.

_s/ Sarah Parady_
Sarah Parady

_s/ Christopher Young_
Christopher Young

_s/ David Seligman_
David Seligman
Attorneys for Plaintiff

PLAINTIFFS' ADDRESS:
C/O Towards Justice
1410 High St., Suite 300
Denver, CO 80218